# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Samuel Der-Yeghiayan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 947 | **DATE** | 3/30/2004 |
| **CASE TITLE** | Rush Presbyterian vs. Prudential Insurance | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached memorandum opinion, the Court hereby grants plaintiff's motion for summary judgment as to Count I and denies plaintiff's motion for summary judgment as to Count II. Furthermore, the Court denies defendant's motion for summary judgment as to Count I and grants defendant's motions for summary judgment as to Count II. All pending dates and motions are hereby stricken as moot. Terminating case. Enter Memorandum Opinion.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | MAR 30 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| MW6 | courtroom deputy's initials | 2004 MAR 30 PM 12:11 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RUSH PRESBYTERIAN - ST. LUKE'S )
MEDICAL CENTER, )
)
        Plaintiff, )
)
v. )   No. 02 C 0947
)
THE PRUDENTIAL INSURANCE )
COMPANY OF AMERICA, )
)
        Defendant. )


DOCKETED
MAR 3 0 2004

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Plaintiff Rush Presbyterian-St. Luke's Medical Center's ("Rush") motion for summary judgment and on Defendant The Prudential Insurance Company of America's ("Prudential") motion for summary judgment. For the reasons stated below we grant Rush's motion for summary judgment on Count I and grant Prudential's motion for summary judgment on Count II.

## BACKGROUND

Plaintiff Rush is a non-for-profit corporation. Defendant Prudential is an

1

insurance company. In August of 1993, Rush and Rush Prudential Health Plans, Rush Prudential HMO, Inc., and Rush Prudential Insurance Company (collectively "Unicare Group") entered into a Medical Service Agreement ("MSA"). The MSA included attachment B which established the rates at which Rush was to be reimbursed by the Unicare Group for various services Rush provides to patients. Attachment B to the MSA underwent several revisions, the last revision occurring on February 1, 1998, was incorporated into the MSA pursuant to the Sixth Amendment to the MSA. In December of 1999, Wellpoint Health Networks, Inc. acquired the Unicare Group from Rush, Rush affiliates and Prudential, and in connectionwith the acquisition, assumed all liabilities for certain disputed claims related to any breach of the MSA by the Unicare Group.

Prudential, Rush and Wellpoint entered into a Settlement Agreement on November 20, 2001. On November 21, 2001, the agreement was amended whereby Prudential agreed to assume any and all liabilities for certain disputed claims and pay Rush 50% of the amounts of the disputed claims upon entry of a final, non-appealable judgment which specifies the amounts of the disputed claims payable under the MSA. The parties agree that amounts have been paid on each of the claims in question, but disagree on whether Rush is entitled to any further payments. The dispute in each count of Rush's complaint is purely a matter of contract interpretation.

In Count I, the issue is whether the $110,000 case rate specified by the MSA

for a bone marrow transplant reimburses Rush only for inpatient services related to the transplant, as asserted by Rush, or whether the case rate reimburses Rush for both inpatient and outpatient services relating to the transplant, as asserted by Prudential. Attachment B, Section A to the MSA consists of four separate subsections: (1) Transplantation; (2) All Other Inpatient Services; (3) Outpatient Services and (4) Skilled Nursing Facility. Rush contends that the organizational structure of the MSA shows that the transplant case rate covers inpatient services only. Prudential relies on the language "Covered Hospital Services" within Section A to Attachment B, which the MSA defined in part as "inpatient and outpatient services . . . not including long term care services" to support its contention that the case rate covers both inpatient and outpatient services.

In Count II, the primary issue is which section of the fee schedule applies to those patients who were treated at the J.R. Bowman Center ("JRB") for extended care inpatient services. Rush asserts that because the inpatient services provided to JRB patients were a continuation of the services that they were receiving at Rush, they should be reimbursed according to the MSA provision that covers "inpatient services" (i.e., the stop loss provision). Under the stop loss provision, Rush claims that Prudential is obligated to reimburse Rush 66% of the charges it incurred providing inpatient services to JRB patients. Alternatively, Prudential asserts that JRB is a skilled nursing facility which therefore entitles Rush to reimbursement pursuant to a $450 per diem rate. The parties both contest the status of JRB, Rush

claiming that it is a post-acute care facility which provides post-hospital inpatient recovery and rehabilitation services and Prudential claiming that it is a skilled nursing facility.

Rush has brought a breach of contract claim based on an alleged breach of a Medical Service Agreement ("MSA") for failure to reimburse Rush for various services provided to insured patients. In Count I, Rush seeks to recover from Prudential $65,783.83 on charges submitted for services provided to 9 patients (John Does I-IX) who underwent bone marrow transplants at Rush Presbyterian-St. Luke's Medical Center under Section A.3 of the MSA. In Count II, Rush seeks to recover $370,324.89 on charges submitted for "extended care services" provided to 12 patients (John Does X-XXI) at Rush's J.R. Bowman Center under Paragraph 2(A) of Attachment B of the MSA.

The parties are before the court based upon diversity jurisdiction. 28 U.S.C.§ 1332(a)(1). Rush claims that it is a non-for-profit corporation organized pursuant to the laws of Illinois and is located in Chicago, Illinois. Prudential claims that it is a New Jersey company with its principal place of business in Newark, New Jersey.

## LEGAL STANDARD

Summary judgment is appropriate when the record reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In seeking a grant of summary judgment the

moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case."*Id.* at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations or denials in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). The court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).

## DISCUSSION

The parties' dispute regarding both claims in this case is purely a matter of contract interpretation. Summary judgment is particularly appropriate in cases involving the interpretation of contractual documents. *Metalex Corp. v. Uniden Corp. of America*, 863 F.2d 1331, 1333 (7th Cir. 1988). Where a contract is unambiguous, a court must determine its meaning as a matter of law, and where the contract is ambiguous the contract's meaning becomes a factual question and the interpretation of the contract and resolution of the ambiguity is left to the trier of fact. *Id.*; *Illinois Conference of Teamsters and Employers Welfare Fund v. Mrowicki*, 44 F.3d 451, 459 (7th Cir. 1994). The lack of ambiguity within the express terms of a contract "forecloses any genuine issue of material fact." *Ryan v. Chromalloy American Corp.*, 877 F.2d 598, 602 (7th Cir. 1989). If the court determines that the relevant provisions of the contract are unambiguous, the court "need not consider extrinsic evidence" and should declare the meaning of the provisions. *Id.*

The language within a contract must be "interpreted according to its plain, ordinary, and popular meaning." *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1038 (7th Cir. 1998)(quoting *O'Rourke v. Access Health, Inc.*, 668 N.E.2d 214, 220 (Ill. App. Ct. 1996)); *See also International Business Lists, Ltd. V. American Tel. & Tel. Co.*, 878 F.Supp. 102, 106 (N.D. Ill. 1994)(stating that "[c]ourt's interpreting contracts must give effect to the parties' intent, and that intent is best determined by

reference to the plain meaning of the words the parties used."). The court must presume that "contracting parties intend[ed] all portions of their contract to carry meaning and no portion was meant to be mere surplusage."*Snelten v. Schmidt Implement Co.*, 647 N.E.2d 1071, 1074 (Ill. App. Ct. 1995). Another rule of contract interpretation is "that a document should be read to give effect to all its provisions and to render them consistent with each other."*Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995). *See also Srivastava v. Russell's Barbecue, Inc.*, 523 N.E.2d 30, 33 (Ill. App. Ct. 1998)(stating that a principle of contract construction is that contracts are to be interpreted as a whole, giving meaning and effect to each provision).

I. Whether Transplant Case Rate Applied to Outpatient Services

Rush argues that pursuant to the express terms and organizational structure of the MSA and Revised Attachment B, Section A, Part 1, the $110,000 case rate for transplantation applies only to those inpatient services, specifically the organ transplant itself, provided to the bone marrow transplant patients. Rush points out Section A has 4 Parts respectively labeled: (1) Transplantation; (2) All Other Inpatient Services; (3) Outpatient Services and (4) Skilled Nursing Facility. Relying on this organizational structure, Rush contends that the use of the verbiage "All Other Inpatient Services" utilized in Part 2 clearly indicates that Part 1 also covers inpatient services. Rush argues that the more broad language in Part 3 covering

"Outpatient Services" further indicates that Part 1 and 2 were not intended to cover services provided on an outpatient basis. Rush further relies on the express terminology "Transplantation" to support their interpretation of the contract. Rush asserts that by its plain meaning, transplantation may only occur on an inpatient basis and that there is no express language in the MSA to support any other interpretation.

Prudential argues that the introductory clause to Section A, which uses the terminology "Covered Hospital Services" evidences the intent of the parties that the case rate for transplantation covers both inpatient and outpatient services. "Covered Hospital Services" is previously defined within the MSA as both "inpatient and outpatient services . . . which are included on Attachment B". Prudential contends that this language can only be reasonably interpreted to include both inpatient and outpatient services in the $110,000 case rate for bone marrow transplants. Prudential also argues that Rush improperly relied on the term "Transplantation" to define the subsection because pursuant to Article VIII, Section D of the MSA the parties agreed that the "headings of the various Articles of [the] Agreement are inserted merely for the purpose of convenience and do not, expressly or by implication, limit or define . . . the specific terms of the Articles so designated." Prudential finally argues that because Part 3 does not read "*All* Outpatient Services" (emphasis added), there is no indication that outpatient services cannot be also included in Part 1 of the Agreement.

The case rate identified in Attachment B to the MSA clearly delineates subsections where different rates of reimbursement apply. Part 1 sets forth the case rate for particular types of organ transplants. The term "transplantation," given its plain and ordinary meaning, must refer to the actual surgical procedure which occurs on an inpatient basis. Had the parties intended an alternative meaning of "transplantation" the term could have been alternatively defined in Article I of the MSA where other possibly ambiguous terms are defined. A term of a contract is "not rendered ambiguous simply because the parties do not agree upon its meaning." *White v. White*, 378 N.E.2d 1255, 1258 (Ill. App. Ct. 1978). The fact that Part II specifically refers to "All Other Inpatient Services" gives additional effect to the reasonable interpretation that Part I also covers certain inpatient services, specifically organ transplants. Viewing the subparts of Section A in light of one another, the only reasonable interpretation is that the case rates set forth in Part I cover only the inpatient services related to the actual organ transplant, not a combination of both inpatient and outpatient services.

Prudential improperly relies on the definition of "Covered Hospital Services" to counter Rush's interpretation of Section A to Attachment B. The term "Covered Hospital Services" is included as part of an introductory clause that gives effect to all subparts, Transplantation, All Other Inpatient Services, Outpatient Services and Skilled Nursing Facility. The fact that "Covered Hospital Services" is defined as both "inpatient and outpatient services . . . which are included on Attachment B"

<mark>-9-</mark>

actually supports this Court's interpretation that the phrase gives meaning to all 3 Parts of Section A.

It is clear from the placement of the term "Covered Hospital Services" in the introduction that it is intended to refer to the various services listed in the three sections of Attachment B which included some inpatient service sections and some outpatient service sections. Section 1 entitled Transplantation does not contain the term "Covered Services." Thus, we would not be reading the MSA according to its plain meaning if we were to find that Covered Services, which includes inpatient and outpatient services, meant that the Transplantation section must also include in-patient and outpatient services.

Furthermore, Prudential's contention that Rush improperly relied on the heading "Transplantation" to define the terms of the Articles within the MSA is without merit. Article VIII, Section D specifically refers to headings of the various Articles of the agreement. Attachment B is not an Article consistent with the structure of the MSA. The MSA contains eight specific Articles which all introduce subject transitions within the contract. Rush is not seeking to give additional meaning to any of those eight articles, but merely requests that the term "Transplantation" be given its plain and ordinary meaning consistent with cannons of contract interpretation. *See Interim Health Care of Northern Illinois, Inc. v. Interim Health Care, Inc.*, 225 F.3d 876, 881 (7th Cir. 2000)(stating that the cannons of contract construction require the court to "construe the words' plain meaning

rather than a broader meaning. . . ."). Therefore, we grant Rush's motion for summary judgment on Count I and deny Prudential's motion for summary judgment on Count I.

II. Reimbursement of Rush

Rush argues that pursuant to the "stop loss" provision of Attachment B, Section A.2(a), it is entitled to be reimbursed 66% of all charges for cases exceeding $52,000. Rush takes the position that because the services provided to patients at the JRB were all part of the same "case", the services provided were merely a continuation of the "Other Inpatient Services", also known as "extended care services" provided at Rush. Rush does not characterize JRB as a Skilled Nursing Facility, but rather relies on the different types of services that are rendered at the facility to determine which provision of the fee schedule should apply. Rush relies on diagnosis codes indicating that patients were transferred for followup care as opposed to custodial care for various conditions to prove that these services were merely a continuation of inpatient services.

Rush initially indicates in its Complaint that JRB is a Skilled Nursing Facility. (Comp. par. 40). Also, pursuant to Local Rule 56.1 Rush admits that JRB is a skilled nursing facility. Rush fails to directly deny Prudential's statement of fact indicating that JRB is a skilled nursing facility. ( R SF 44). Instead, Rush responds simply by summarizing an affidavit of Barbara J. Martin, Director of Nursing at JRB. *See*

*Jankovich v. Exelon Corp.*, 2003 WL 260714, at *5 (N.D. Ill. 2003)(indicating that evasive denials, that do not directly oppose an assertion are improper and thus the contested fact is deemed to be admitted pursuant to Local Rule 56.1).

Prudential argues that the rate of reimbursement for these services is determined by Section A.4 which expressly defines rates which apply to a "Skilled Nursing Facility". Prudential contends that throughout the series of revisions of the MSA and Attachment B, that Skilled Nursing Facility services have always been treated separately and distinctly from all other inpatient service cases. Prudential specifically notes that Skilled Nursing Facility services are not listed in the services that are covered under the stop loss provision of Section A.2, although they could have easily been added were that the intent of the parties. Prudential also relies on the fact that the Skilled Nursing Facility provision is more specific than the general "All Other Inpatient Services" language within Section A.2. Based on this observation, Prudential urges the court to apply the specific contractual provisions of Section A.4 over the general contractual provisions of Section A.2. Furthermore, Prudential notes that Section A.4 does not explicitly contain a stop loss prevision and thus the court should not be inclined to read such a provision into the contract where it does not exist.

A court should be wary of reading terms into a contract and "[t]here is a strong presumption against provisions that easily could have been included in the contract but were not." *Wright v. Chicago Title Ins. Co.*, 554 N.E.2d 511, 514 (Ill. App. Ct.

1990). A court will not add another term to an agreement where an agreement is silent. *American States Insurance Co. v. A.J. Maggio Co., Inc*, 593 N.E.2d 1083, 1086 (Ill. App. Ct. 1992). A "well-settled principle of contract construction [is] that where a contract contains both general and specific provisions relating to the same subject, the specific provision controls." *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, 984 F.2d 223, 227 (7th Cir. 1993).

In the case at hand, the original and revised versions of Attachment B both contained a Section 2 that governed "All Other Inpatient Services". Attachment E was added to the MSA by the First Amendment to the contract and while at that time separate from the revised Attachment E, provided that Rush was entitled to reimbursement at a rate of $450 per diem for care received in a Skilled Nursing Facility. The Sixth Amendment to the MSA, effective on February 1, 1998 deleted Attachment E in its entirety and incorporated the Skilled Nursing Facility Provision, A.4 into Revised Attachment B. Section A.2, "All Other Inpatient Services" at no time contained any language indicating that it applied to services rendered in a Skilled Nursing Facility. Section A.4 is exclusively devoted to services provided at a Skilled Nursing Facility and does not include a stop loss provision. There is no additional language within Attachment B that indicates any additional reimbursement is necessitated above the $450 per diem rate expressly listed.

Central to the inquiry, Prudential asserts, and Rush has not refuted, that the JRB is a Skilled Nursing Facility. Because Attachment B specifically delineates "All

Other Inpatient Services" from services derived at a "Skilled Nursing Facility", the only reasonable interpretation is that Rush is only entitled to reimbursement for these services pursuant to Section A.4 of Attachment B. Where specific contractual provisions are present, the court must apply those provisions over any general provisions listed within the contract. *See Central Die Casting and Mfg. Co. v. Tokheim Corp.*, 1995 WL 699714 at *4 (N.D. Ill. 1995)(stating that "when a contract contains both general and specific provisions relating to the same subject, the specific provision controls")(quoting *Dolezal v. Plastic Resonstructive Surgery, S.C*, 640 N.E.2d 1359, 1366 (Ill. App. Ct. 1994)).

Rush argues that Section A.2(a) should cover the services provided at JRB and that the court should overlook the basic fact that JRB is a Skilled Nursing Facility. Rush improperly relies on two particular factors in their arguments. First, Rush relies on the diagnosis codes utilized for the patients at issue. The codes describing the types of services provided, "post-surgical care" and "post congestive heart failure" are irrelevant to the query. Such administrative codes are not determinative of the actual type of care or the proper category of care under the MSA. Second, the reliance on affidavit testimony of Barbara J. Martin, Director of Nursing is misplaced because her conclusion that the JRB provides the type of care covered under Section A.2(a) is not relevant for interpreting the intent of the parties at the time the MSA and Attachment B were implemented.

Rush itself referred to JRB as a skilled nursing facility in its complaint. Rush states that "[a] number of insured patients were transferred from Rush to skilled nursing facilities for provision of extended care services . . . [and that] patient John Doe X was transferred to the J.R. Bowman Center ("JRB") for provision of extended care inpatient services." ( R SF 40, 41). The affidavit from Rush appears to be nothing other than an attempt to rephrase the JRB services after Rush realized that it could not recover under A.2(a). The threshold question for Illinois' "four corners" test contract interpretation is "whether the contract is ambiguous." *Bourke*, 159 F.3d at 1036. If the relevant provisions of a contract are not ambiguous, then the provisions "should be generally enforced as they appear, and those terms will control the rights of the parties." *Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 368 (Ill. 1998)(citations omitted). Rush is unable to present any provision within the contract that evidences intent that services rendered at a Skilled Nursing Facility are subject to reimbursement under Section A.2(a). Accordingly, Rush's motion for Summary Judgment on Count II is denied and Prudential's motion for Summary Judgment on Count II is granted. Services rendered to John Does X-XXI must be reimbursed pursuant to Section A.4, the Skilled Nursing Provision, of Attachment B.

## CONCLUSION

For the reasons stated above, we grant Plaintiff Rush's motion for summary judgment on Count I and deny Plaintiff Rush's motion for summary judgment on

Count II. Furthermore, Defendant Prudential's motion for summary judgment on Count I is denied and Defendant Prudential's motion for summary judgment on Count II is granted.

_____
Samuel Der-Yeghiayan
United States District Court Judge

Dated: March 30, 2004